# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| THE VARIABLE ANNUITY LIFE INSURANCE COMPANY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| WILLIAM "BOBBY" JOINER and KIMBERLY JOINER, | : | |
| Defendants. | : | NO. CV206-110 |

## O R D E R

Plaintiff, the Variable Annuity Life Insurance Company ("VALIC"), filed the above captioned diversity action against Defendants, William "Bobby" Joiner and Kimberly Joiner, (collectively, the "Joiners"), alleging numerous federal and state claims, including breach of contract and misappropriation of trade secrets, related to the Joiners' conduct prior and subsequent to tendering their letters of resignation to VALIC. The matter is presently before the Court on VALIC's motion for a preliminary injunction. VALIC seeks to enjoin the Joiners

AO 72A
(Rev. 8/82)

from inducing VALIC customers to roll their VALIC accounts to Merrill Lynch, the Joiners' new employer.

## BACKGROUND

After conducting an evidentiary hearing, the Court entered a temporary restraining order on May 26, 2006, enjoining the Joiners from directly or indirectly using the identity and account information of VALIC clients to induce, either directly or indirectly, future roll outs of VALIC accounts to Merrill Lynch and, ordering the Joiners to return any VALIC property in their possession to VALIC.

Having shortly thereafter granted the Joiners' motion to compel arbitration and stay the proceedings in this Court, the Court mistakenly believed its role in this matter was finished. Once the National Association of Securities Dealers, Inc. Panel declined to exercise jurisdiction and dismissed the matter, however, the Joiners were left with no venue in which to seek relief from the temporary restraining order. Thus, the Court lifted the stay and VALIC's request for preliminary injunction came before the Court for a full evidentiary hearing on August 21, 2006. Pursuant to Federal Rule of Civil Procedure 52(a), and based on the evidence adduced at both hearings and the

parties' moving papers, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. William "Bobby" Joiner, began employment with VALIC in July 1992 and Kimberly Joiner began in December 2003. (May 25, 2006 Hr'g Tr. 36:18-20, 136:23-24.)

2. The Joiners, as VALIC financial advisors, marketed and sold VALIC products, including tax exempt I.R.C. § 403(b) organization group accounts, VALIC's primary market. (See May 25, 2006 Hr'g Tr. 61:19-22.)

### I. VFA Agreement

3. As a condition of employment, the Joiners were required to (a) execute a Registered Representative Agreement ("Agreement") with VALIC Financial Advisors Inc. ("VFA"), a wholly owned subsidiary of VALIC and a registered member of the National Association of Securities Dealers ("NASD") and (b) register and become licensed with NASD. (See May 25, 2006 Hr'g Tr. 38:25-39:8.)

4. The Agreement contains the following nonsolicitation covenant:

> During the term of this Agreement and for a period of one (1) year after its termination, Registered Representative will not directly or indirectly induce or attempt to induce any Protected Customer to either (a) end or alter his or her relationship with Broker-Dealer or Protected Companies, or (b) accept business relating to competing products or services from any Protected Customer, except in the performance of his or her regular duties as a Registered Representative of Broker-Dealer. A "Protected Customer" is defined as any person who is or was a customer of Broker-Dealer or its Protected Companies, and who was within Registered Representative's Territory and assigned to Registered Representative at any time during the one-year period immediately preceding termination of this Agreement.

(Agreement § 4(h)(2).)

   5. The Agreement also contains the following nondisclosure or use of trade secret covenant:

> **Trade Secrets.** Broker-Dealer's and Protected Companies' Trade Secrets include, but are not limited to, their customer identities and account information and the materials, processes, data, documentation, and knowledge embodied in 4SIGHT, AgileNet, and other licensed software described in the Computer Schedule. Such information is a trade secret, whether contained in an electronic, printed or other format, or whether committed, in whole or part, to Registered Representative's memory. Broker-Dealer or Protected Companies will license said software to Registered Representative according to the terms set forth in the Computer Schedule. Registered Representative shall not, during the term of this Agreement, or at any time after its termination, disclose or use, directly or indirectly, any Trade Secrets of Broker-Dealer or Protected Companies, including but not limited to, customer identities and account information, except in the regular course of Registered Representative's business with Broker-Dealer or Protected Companies.

AO 72A
(Rev. 8/82)

(Agreement § 4(g)(3)(a).)

6. Finally, the Agreement contains the following nondisclosure or use of confidential and proprietary information covenant:

> **Other Confidential and Proprietary Information.** Broker-Dealer's and Protected Companies' Other Confidential and Proprietary Information includes, but is not limited to, customer requirements and other software and marketing plans provided to Registered Representative by Broker-Dealer or Protected Companies, whether maintained electronically or otherwise. As to this Other Confidential and Proprietary information, Registered Representative shall not, during the term of this Agreement, and for a period of two (2) years following its termination, disclose or use any such Other Confidential and Proprietary Information, directly or indirectly, except in the regular conduct of Registered Representative's business with Broker-Dealer or Protected companies.

(Agreement § 4(g)(3)(b).)

## II. The Joiners' Move to Merrill Lynch

7. The Joiners surreptitiously planned their move from VALIC to Merrill Lynch. The Joiners began "thinking about" leaving VALIC and joining Merrill Lynch no later than January 1, 2006, (Joiner Dep. 61:17-63:2), and had "meeting[s] of substance" with Merrill Lynch management about transferring to Merrill Lynch no later than January 12, 2006, (Joiner Dep. 69:5-15).

8. One topic of discussion with Merrill Lynch management was how many of the Joiners' VALIC clients could be moved from VALIC to Merrill Lynch. (Joiner Dep. 70:19-72:5.)

9. The Joiners knew they were going to work at Merrill Lynch by the last week of February 2006. (Joiner Dep. 14:7-10.)

10. Mr. Joiner began employment with Merrill Lynch, VALIC's competitor, and his NASD registration with Merrill Lynch became effective, on March 21, 2006, the same day the Joiners tendered letters of resignation to VALIC. (See May 25, 2006 Hr'g Tr. 41:14-42:11; Pl.'s Ex. C, Mr. Joiner's NASD Registration.)

III.   **Breach of Agreement**

11. At the time Mr. Joiner signed the Agreement, he believed the restrictive covenants contained in the Agreement were unenforceable. (May 25, 2006 Hr'g Tr. 60:8-61:11.)

12. The Joiners breached the terms of the Agreement by soliciting their former VALIC customers to roll their VALIC accounts to Merrill Lynch because Defendants did not believe the nonsolicitation provision was valid. (Joiner Dep. 24:1-17.)

6

13. The Joiners targeted the forty (40) highest balance VALIC customers to induce or attempt to induce to roll their VALIC accounts to Merrill Lynch. (Joiner Dep. 101:5-24.)

14. The Joiners attempted to induce former group clients to open payroll slots with Merrill Lynch. (Joiner Dep. 71:18-72:5; May 25, 2006 Hr'g Tr. 68:25-69:3.)

15. The Joiners directly solicited 90% of the clients who rolled out accounts from VALIC to Merrill Lynch. (May 25, 2006 Hr'g Tr. 100:8-19.)

16. The Joiners contacted former customers based on their memory of the customer financial status and contact information. (Joiner Dep. 87:17-88:16, 89:5-14, 101:15-102:3; May 25, 2006 Hr'g Tr. 52:2-14.)

17. The sources of the information contained in the Joiners' 2006 day planners and retained in the Joiners' memory after tendering their resignations to VALIC, are customers, AgileNet, 4SIGHT, the VALIC Care Center, and communications from VALIC. (Joiner Dep. 55:19-56:22.)

18. The Joiners understood client identification and account information to be the most valuable information VALIC owns. (May 25, 2006 Hr'g Tr. 73:8-22.)

AO 72A
(Rev. 8/82)

19. In the two months between the Joiners' tendering their resignations to VALIC and the May 25, 2006 hearing, at least 32 accounts belonging to 27 VALIC customers, totaling approximately $4.5 million dollars, had been rolled out of VALIC accounts to accounts managed by Merrill Lynch, Defendants' current employer. (See May 25, 2006 Hr'g Ex. C1.)

20. Since May 25, 2006, seven additional accounts previously assigned to the Joiners, totaling approximately $1.1 million dollars, have been rolled out of VALIC accounts and into accounts managed by Merrill Lynch. (See August 21, 2006 Hr'g Pl.'s Ex. G.)

21. The Joiners concede that, absent judicial order, they will continue to solicit VALIC individual and group clients to roll their VALIC accounts to accounts managed by Merrill Lynch. (May 25, 2006 Hr'g Tr. 86:18-87:10.)

## CONCLUSIONS OF LAW

### I. Preliminary Injunction Standard

1. To be entitled to preliminary injunctive relief, VALIC must demonstrate: (a) a substantial likelihood of success on the merits; (b) that irreparable harm will be suffered unless the injunction is issued; (c) the threatened injury to the

moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (d) if issued, the injunction would not be adverse to the public interest. See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 968 (11th Cir. 2005); Schiavo v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir.), reh'g en banc denied, 403 F.3d 1261 (2005).

### A. Likelihood of Success on the Merits

2. VALIC, as a third party beneficiary to the Joiners' Agreements with VFA, has legal standing to enforce its rights under the Agreements. Under Georgia law, third party beneficiaries to a contract may sue in their own names to enforce the contract, but it must clearly appear from the contract that it was intended for their benefit. O.C.G.A. § 9-2-20(b); Satilla Community Serv. Bd. v. Satilla Health Servs., Inc., 275 Ga. 805, 573 S.E.2d 31 (2002) (citations omitted). In addition to the protections specifically afforded VALIC as a protected company in the nondisclosure and nonsolicitation covenants at issue, the Agreement provides a different mechanism for protected companies to seek recovery

for any alleged breach of the Agreement. (<u>See</u> Agreement § 11(b).)

3. The parties contend that the Agreement is not an employment agreement. However, as aptly observed by Judge Edenfield in <u>Wachovia Ins. Servs., Inc. v. Paddison, et al.</u>, CV406-83 (S.D. Ga. July 18, 2006), "[o]ne can call a stallion a cow until one tries to get milk from it." It is undisputed that the Agreement defines the conditions of the Joiners' employment with VALIC. Further, there is no evidence in the record that the Joiners had any bargaining power to negotiate the terms of the Agreement. Thus, employment contract strict scrutiny applies to the restrictive covenants contained in the Agreement. <u>See</u> <u>MacGinnitie v. Hobbs Group, LLC</u>, 420 F.3d 1234, 1241 (11th Cir.), <u>reh'g</u> and <u>reh'g en banc denied</u>, 165 Fed. Appx. 854 (2005), ("Georgia law is clear, however, that even when an employment dispute is part of the sale of a business, if the dispute itself pertains to a contract of employment then the contract must be interpreted under the law governing such contracts.").

4. Under Georgia law, restrictive covenants are enforceable if the restraint imposed: (1) is reasonable; (2) is founded on valuable consideration; (3) is reasonably

AO 72A
(Rev. 8/82)

necessary to protect the interest of the party in whose favor it is imposed; and (4) does not unduly prejudice the interests of the public. W.R. Grace & Co. v. Mouyal, 422 S.E.2d 529, 531 (Ga. 1992). It is undisputed that the consideration as agreed between the parties to the Agreement constitutes valid consideration. (See Agreement Preamble.)

5. The nonsolicitation covenant contained in the Agreement is reasonable. Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court. Whimsical Expressions, Inc. v. Brown, 275 Ga. App. 420, 423, 620 S.E.2d 635, 637 (2005). Courts apply a "three element test of duration, territorial coverage, and scope of activity . . . in examining the reasonableness of the particular factual setting to which it is applied." Id. (citing W.R. Grace & Co., supra at 465, 422 S.E.2d 529.). The nonsolicitation covenant at issue prohibits the Joiners, during the term of the Agreement and for a period of one year after their termination, from "directly or indirectly induc[ing] or attempt[ing] to induce any Protected Customer to either (a) end or alter his or her relationship with Broker-Dealer or Protected Companies, or (b) accept business relating to competing products or services from any

Protected Customer . . .." (Agreement § 4(h)(2).) A "Protected Customer" is limited to those customers who were "within [the Joiners'] Territory and assigned to [the Joiners] at any time during the one-year period immediately preceding termination of this Agreement." (Id.) VALIC narrowly tailored the nonsolicitation covenant at issue as reasonably necessary to protect its valuable confidential and proprietary information.

6. The language at issue in the nonsolicitation covenant is not ambiguous. The Joiners contend that the nonsolicitation covenant is unenforceably ambiguous because it nonsensically prohibits customers from accepting business from other customers. For the purpose of contract construction, an "'[a]mbiguity' is defined as duplicity, indistinctness, and uncertainty of meaning or expression used in a written instrument," and includes language "open to various interpretations." RLI Ins. v. Highlands of Ponce, LLC, -- S.E.2d --, 2006 WL 1827456, *3 (Ga. App. July 5, 2006) (quoting Early v. Kent, 215 Ga. 49, 50, 108 S.E.2d 708, 709 (1959)). While it may be highly improbable that customers will accept business from other customers, there exists no ambiguity as to the Joiners' responsibility. The nonsolicitation covenant

prohibits the Joiners from inducing or attempting to induce a customer to either (1) end or alter their relationship with VALIC, or (2) accept business relating to competing products and services from other customers. Thus, the nonsolicitation covenant is enforceable.

      7. The nondisclosure and use covenants contained in the Agreement are reasonable and enforceable. "[I]n determining the reasonableness of a covenant not to disclose, the courts must consider '1) whether the employer is attempting to protect confidential information relating to the business, such as . . . methods of operation, names of customers, personnel data . . . and 2) whether the restraint is reasonably related to the protection of the information.'" Wiley v. Royal Cup, Inc., 258 Ga. 357, 359, 370 S.E.2d 744, 746 (1988) (quoting Durham v. Stand-by Labor of Ga., Inc., 230 Ga. 558(2)(b), 198 S.E.2d 145 (1973)). The covenants in the instant case specifically prohibit the disclosure or use of VALIC's customer identities, account information, requirements, plans, in addition to the materials and information contained in its computer software. The Joiners acknowledged in the Agreement that these items constitute trade secrets and confidential information.

8. Pursuant to the terms of the Agreement, the identification and account information of the Joiners' highest balance VALIC customers, in both tangible form as contained in the Joiners' 2006 day planners and intangible form as contained in the Joiners' personal knowledge, constitute VALIC trade secrets and confidential information. (See Agreement §§ 3(a) & (b)); O.C.G.A. § 10-1-761(4) ("'Trade secret' means information, without regard to form, including, but not limited to, technical or nontechnical data, . . . financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."); Manuel v. Convergys Corp., 430 F.3d 1132, 1140-41 (11th Cir. 2005) (citing DeGiorgio v. Megabyte Int'l, Inc., 266 Ga. 539, 468 S.E.2d 367, 369 (1996) and Avnet, Inc. v. Wyle Lab., Inc., 263 Ga. 615, 437 S.E.2d 302 (1993), and holding that parties may contract "above

and beyond the protections of Georgia law [to include personal knowledge] with a valid nondisclosure agreement").

9. The lack of a temporal limitation on the trade secret covenant does not invalidate that provision. Trade secrets, unlike other restrictions, do not require a time limitation. See <u>Am. Software USA, Inc. v. Moore</u>, 264 Ga. 480, 483, 448 S.E.2d 206, 209 (1994) (Nondisclosure restrictive covenant whereby employee agreed not to use or disclose any trade secrets <u>at any time</u>, and to use or disclose any confidential business information until ten years after termination of employment, was not unreasonable).

10. VALIC has made a sufficient showing to establish the likelihood of success on the merits of its breach of the terms of the nonsolicitation and nondisclosure covenants contained in the Agreement. The Joiners concede that they directly contacted their forty highest balance customers to induce them to roll their VALIC accounts to Merrill Lynch. The information necessary to identify and contact these customers were contained in the Joiners' 2006 day planners and retained in the Joiners' memory after tendering their resignations to VALIC. The source of this information includes VALIC customers, AgileNet, 4SIGHT, the VALIC Care Center, and communications

AO 72A
(Rev. 8/82)

from VALIC. Such conduct is prohibited under the nonsolicitation and nondisclosure covenants.

### B. Irreparable Harm

11. The Court finds no reason to alter its previous conclusion that VALIC has established a substantial threat that it will suffer irreparable harm if the injunction does not remain in force. "An injury is irreparable only if it cannot be undone through monetary remedies." Cate v. Oldham, 707 F.2d 1176, 1189 (11th Cir. 1983); see also Siegel v. LePore, 234 F.3d 1163, 1191 n.4 (11th Cir.), reh'g denied, 234 F.3d 1218 (2000) (quoting Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987)). VALIC will suffer irreparable injury if the Joiners are allowed to continue use of VALIC's client identity and account information to solicit VALIC customers because VALIC will be deprived of the value of the trade secret and confidential information in which it has invested significant time and money. Further, VALIC's resulting harm from lost accounts and lost customer goodwill and business is irreparable because it is neither easily calculable, nor easily compensable and is, therefore, an appropriate basis for injunctive relief. See Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449

(11th Cir. 1991) (finding irreparable harm due to loss of good will and long time customers).

### C. Balance of Harm

12. The balance of harm tips decidedly toward VALIC. The Joiners concede that they directly solicited at least 90% the VALIC customers who have rolled their accounts, totaling approximately $5.5 million dollars, from VALIC to Merrill Lynch since the Joiners tendered their resignations to VALIC. The continued threat of injury to VALIC far exceeds any damage the Joiners are likely to suffer. The Joiners took a calculated risk, albeit hedged by Merrill Lynch's agreement to pay all legal fees and any judgment that may be rendered against them, when they elected to violate the terms of the Agreement rather than seek a declaratory judgment as to the validity of the restrictive covenants.

### D. Public Interest

13. Finally, the public interest will not be disserved by the preliminary injunction. It is clear that the Joiners carefully orchestrated their plan to take their highest balance VALIC clients with them to Merrill Lynch. The Joiners began

AO 72A
(Rev. 8/82)

having "meetings of substance" with Merrill Lynch management, which included discussions as to how many of the Joiners' VALIC clients could be moved to Merrill Lynch, in mid-January 2006, and the Joiners knew they would be going to work at Merrill Lynch by the last week of February, almost two months prior to tendering their letters of resignation to VALIC. To date, the Joiners have successfully implemented their plan by rolling VALIC accounts in the amount of more than 5.5 million dollars to Merrill Lynch.

VALIC is only seeking to enjoin the Joiners from continuing to use VALIC's trade secret and confidential information to solicit VALIC customers to roll VALIC accounts to Merrill Lynch. As recently noted by the Georgia Supreme Court,

> The employer has a protectible interest in the customer relationships its former employee established and/or nurtured while employed by the employer, and is entitled to protect itself from the risk that a former employee might appropriate customers by taking unfair advantage of the contacts developed while working for the employer.

Palmer & Cay of Ga., Inc. v. Lockton Companies, Inc., 280 Ga. 479, 484, 629 S.E.2d 800, 804 (2006) (quoting W.R. Grace & Co., 262 Ga. at 466(2), 422 S.E.2d 529); see also Wachovia Ins. Servs., Inc. v. Paddison, et al., CV406-83 (S.D. Ga. July 18,

2006) (recognizing efforts under Georgia law to protect an employers' investments, including customer contacts, proprietary data and processes, from piracy by former employees.) Further, "when a duty has been imposed upon an employee pursuant to contract not to disclose confidential business information upon termination of employment, public policy is swung in favor of protecting these commercial intangibles and of preventing unfair methods of exploiting them in breach of duty." Lee v. Envtl Pest & Termite Control, Inc., 271 Ga. 371, 373-74, 516 S.E.2d 76, 78 (1999) (quoting Durham, 230 Ga. at 563-64, 198 S.E.2d 145); see also Rollins Protective Servs. Co. v. Palermo, 249 Ga. 138, 142, 287 S.E.2d 546, 550 (1982). A cognizable public interest exists in upholding an agreement pursuant to which an employer sought to protect itself from post-termination piracy of the most valuable information it owns, as well as discouraging employees from breaching their employer's trust and misappropriating trade secret and confidential information for their own gain.

**CONCLUSION**

Having made the foregoing Findings of Facts and Conclusions of Law, VALIC's motion for preliminary injunction (Doc. No. 1) is **GRANTED**.

**SO ORDERED**, this 31st day of August, 2006.

　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　JUDGE, UNITED STATES DISTRICT COURT
　　　　　　　　　　　　　　　SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)